UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v.                                      )<br>)<br>MICHAEL R. DEPPE,              )<br>            Defendant        ) | Cr. No. 05-40007-FDS |

## AFFIDAVIT OF COUNSEL

I, Steven J. Rappaport, Esq., attorney of record for the defendant in the above-referenced matter, hereby depose and aver as follows:

1. On March 3, 2005, the defendant was released from custody on a $150,000.00 Unsecured Bond with restrictive conditions pending trial of this matter.

2. One such condition of his release calls for the defendant to have no access to or use of any computer and for the defendant to have no computers in his residence. In order to enforce this restriction, the defendant has signed an authorization for his residence to be randomly searched by any Law Enforcement Agency.

3. On April 5, 2005, I received a telephone call from the defendant in which the defendant asked me whether Blanchard had the authority to interrogate him. (Based upon the proceedings conducted at the Release/Detention Hearing before this Court I knew that Mr. Blanchard is a United States Postal Inspector and the lead agent for the Government with regard to the allegations contained within the

instant indictment). I was somewhat taken aback and asked the defendant to explain to me what he was talking about. After a short explanation, I arranged to meet with the defendant at my office. The defendant came to my office.

4. The defendant proceeded to inform me of the following events. At approximately 7:30 a.m. on April 5, 2005 Inspector Blanchard, a second plainclothes agent and a uniformed Hudson, MA police officer appeared at the defendant's residence and informed him that they were there to conduct a search pursuant to the Pretrial Release Order. The agents possessed no search warrant. The defendant invited them into the house. The agents brought with them items of personalty which they were returning to the defendant. The defendant signed a receipt for the returned items. At this point Blanchard asked the defendant, "Where's the Denali [automobile]? Did you sell it?" The defendant did not respond. As the other offices left their immediate presence, Blanchard asked the defendant, "Are you gay?" The defendant responded, "No." Blanchard then stated, "We're finding porn on your computer. Were you the only one with access to it?" The defendant responded that others did have access to the computer. Blanchard responded, "You might want to get your story straight because that is all coming out." The defendant didn't respond. Blanchard then asked, "Did you start your job at Lexus yet?" The

defendant didn't respond. Blanchard then asked, "Was Jessica [the defendant's wife] able to sell the two watches the other day?" The defendant didn't respond.

5. Blanchard then began searching a desk drawer. Stopping and reading a Discover card chargeback notification with the name Bryan T. Theis (an individual who, upon belief, it is alleged that that the defendant defrauded with regard to items of sports memorabilia), Blanchard asked, "You have the helmets and stuff right here. Why didn't you just send it to him?" The defendant responded, "Are you allowed to ask me questions without my lawyer being present?" Blanchard responded, "Yes." Blanchard then resumed looking through the drawer at various documents and at one point stated, "Oh. A contract with your wife?" The defendant responded by questioning Blanchard as to the scope of his authority to search. Blanchard responded by saying he could search whatever he wanted to. The defendant stated that he believed that Blanchard's authority to search was limited to searching for computers only. Blanchard then stated that he would straighten it out today and return later.

6. I immediately called the defendant's Pretrial Services Officer and left her a voicemail that I needed to speak with her. I then called Assistant U.S. Attorney Bookbinder.

7. I informed Mr. Bookbinder of what the defendant had reported to me. Bookbinder agreed that it was highly inappropriate for Blanchard to interrogate the defendant, if he had in fact done so. As a result of that conversation I was left with the clear impression that Blanchard would no longer be personally performing the administrative searches.

8. At approximately 6:00 p.m. I received a call from the Pretrial Services Officer. I explained what had been reported to me by the defendant, however, I further informed her that I believed I had reached an accord with Mr. Bookbinder and the matter needed no further official attention.

9. On April 6, 2005, as I was on my way to the Middlesex Superior Court Clinic on a client related matter I checked my voicemail, Mr. Bookbinder had left two messages for me. The first at 5:26 p.m. on April 5, stated that he was concerned that some of the items Blanchard saw in the drawer concern this case, that there was evidence in the drawer which he was interested in and that he feared that the defendant might try to destroy this potential evidence. The second message at 9:19 a.m. on April 6, 2005, stated that there was a particular document of interest to him – not the chargeback. I was unable to return the call to Mr. Bookbinder at that time.

10. I concluded my meeting at the clinic and proceeded to the library to prepare for a trial scheduled for April 7, 2005. At approximately 2:30

p.m. I received a telephone call from the defendant who informed me that a short while ago, while he was on the telephone with his Pretrial Services Officer, Lt. Burkes (sic) and Detective Devlin of the Hudson Police Department pulled into his driveway. The defendant asked the Pretrial Services Officer why the police were at this house. She didn't know why. The defendant hung up the telephone and asked Lt. Burkes (the uniformed officer who appeared at the defendant's residence the previous day with Blanchard) why they were at his house. Lt. Burkes responded that the defendant's lawyer and Inspector Blanchard had agreed that the defendant would turn over a document Blanchard had discovered in the defendant's desk the previous day. The defendant allowed the officers into his house. They searched his desk drawer but did not find the document they were looking for. The officers then contacted Blanchard, thanked the defendant for his time and left the premises.

11. Other than the day I questioned Mr. Blanchard at Release/Detention Hearing, I have never to my knowledge spoken to him. I certainly never entered into any agreement with him or AUSA Bookbinder as represented to the defendant by Hudson officers.

12. I immediately placed a telephone call to Mr. Bookbinder and expressed my outrage with regard to Mr. Blanchard's purported

misrepresentations to the Hudson police regarding any agreement he had entered into me.

13. Mr. Bookbinder assured me that he would speak with Mr. Blanchard concerning the alleged misrepresentation.

14. On April 7, 2005 I conferred with Mr. Bookbinder. According to Mr. Bookbinder, Blanchard informed the Hudson police that the AUSA and the defendant's attorney had agreed that Blanchard would no longer be conducting the searches at the defendant's residence. Blanchard told Mr. Bookbinder that he told the Hudson police that the AUSA had authorized them to take the target document(s) as long as the defendant consented to allow them in the house to search.

15. On April 7, 2005 I met with the defendant for the purpose of having the defendant turn over to me all documents which he maintained in his desk drawers. I have had the opportunity to review that documentary material. The document which Blanchard allegedly saw was not a part of the voluminous documentary material turned over to me.

16. Part of the documentary material turned over to me by the defendant includes correspondence from undersigned counsel to the defendant, related to the defense of this case. I believe there is a fair inference that Mr. Blanchard, the primary case agent in this prosecution, read counsel's notes to the defendant.

17. Furthermore, it is undersigned counsel's policy where there is no protective order in effect to preclude counsel from providing the defendant with documentary evidence in a case, to provide the defendant with copies of documents received from the Government. One such document, an Out of Town Ticket Agency receipt, Exhibit 2, at the Release/Detention Hearing, was provided by undersigned counsel to the defendant after the defendant's release from custody. I believe it is this document which Blanchard alleges he saw in the defendant's desk drawer.

_____
Steven J. Rappaport