UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | Case No. 05-40007-FDS |
| v. ) | |
| ) | |
| MICHAEL R. DEPPE, ) | |
| ) | |
| Defendant. ) | |
| ) | |

GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION
TO SUPPRESS EVIDENCE OBSERVED DURING CONSENT SEARCH

Because the one piece of evidence from the April 5, 2005 consent search of the defendant's house that the United States intends to offer at trial is testimony about a document that was in plain view, the United States asks the Court to deny the defendant's motion to suppress.

BACKGROUND AND FACTS

A.   The charges and conditions of release

This case began when Michael Deppe was charged with mail fraud in a February 4, 2005 Complaint and arrested on that same date in Florida. A grand jury indicted him, initially on February 23, 2005, and again in a superseding indictment on March 30, 2005. The superseding indictment charges him with 12 counts of wire fraud and four counts of mail fraud for an internet auction fraud scheme he executed from March, 2003, through February, 2005. The essence of this scheme is that Deppe collected approximately $370,000, from customers he dealt with over the internet, as payment for items ranging from Rolex watches

to Superbowl tickets, but then never provided the items or refunded the money.

Deppe's detention hearing, which he elected to have in Massachusetts rather than Florida, took place on March 3, 2005, before Chief Magistrate Judge Swartwood. After an evidentiary hearing, Magistrate Judge Swartwood, over the government's objection, ordered Deppe released on a series of conditions.[1] One of these conditions was that Deppe have "no access to or use of any computer, no computer in residence; sign authorization for home to be randomly searched by any law enforcement agency. Wife to sign authorization as well." Order Setting Conditions of Release, p.2 [attached to Defendant's Memorandum in Support of Motion to Suppress]. As ordered by the court, Deppe signed a "Consent to Search" form, which states: "I, Michael Deppe, and my wife, Jessica Deppe, knowingly and voluntarily consent to allow unannounced searches of our home . . . ." Defendant's Consent to Search [Attachment A]. On the consent form, Deppe handwrote, "My understanding is that the search is for computers only." Id.

B. The consent search

On April 5, 2005, the case agent, Postal Inspector Michael Blanchard, along with Hudson Police Lieutenant Michael Burks and a Postal Inspection Service student intern, went to Deppe's Hudson, Massachusetts house. Their purpose was to return items seized from Deppe at the time of his arrest and to search the house for computers or other electronic

---

[1] Deppe is no longer on pretrial release. In a December 5, 2005 order, after a multi-day evidentiary hearing, Magistrate Judge Swartwood found that Deppe had violated the conditions of release and that no other conditions would be sufficient, and he therefore ordered Deppe detained pending trial.

equipment consistent with computer usage. 4/5/05 Blanchard memo to file [Attachment B]. After Deppe let the group into the house, Inspector Blanchard gave Deppe the seized items and then asked him several questions.[2] Because the government will not seek to use, at trial, Deppe's terse responses to these questions, the Court need not address their propriety.

Inspector Blanchard then searched the room in the house that appeared to be an office. Id. In this room was a large desk, with drawers large enough to hold a laptop computer or PDA. Id. When he opened the top right-hand desk drawer, he immediately saw a version of one of the most significant documents that the government obtained during its investigation – the fraudulent "Out of Town Ticket Agency receipt" that Deppe had given to his business partner, William Englehart.[3] Id. While the Out of Town receipt was partially covered by a folded bank notice, id., Inspector Blanchard could see most of it. What was of particular evidentiary value about this version of the receipt was that, unlike the version Englehart received from Deppe, this one had no "Jonathan Cohen" signature on it. 4/8/05 Inspector Blanchard memo [Attachment D]. Unsure whether he should seize the receipt,

---

[2] Inspector Blanchard asked Deppe about his wife's recent attempt to sell two Rolex watches, about "gay" pornography Postal Inspectors had found on Deppe's computer, and, later, about a bank bill indicating that a customer had not received sports memorabilia for which he had paid Deppe. Id.

[3] The version of the "Out of Town Ticket Agency" receipt that Deppe gave to Englehart [Attachment C] appears to be signed by "Jonathon Cohen" and states that the ticket agency has received $183,000 for Superbowl tickets. Deppe produced this receipt after Englehart insisted on seeing documentation that Deppe was using the money coming from customers to pay for Superbowl tickets. But the president of Out of Town Ticket Agency, Sheldon Cohen, has told the government that there is no "Jonathon Cohen" at the agency, that the letterhead used on this "receipt" is not Out of Town's letterhead, and that Out of Town never received any money from Deppe for Superbowl tickets.

Inspector Blanchard showed it to Lieutenant Burks and then returned it to the drawer.[4] Inspector Blanchard then resumed his search, which did not yield evidence of computer usage.

## ARGUMENT

Deppe claims that, when Inspector Blanchard opened Deppe's desk drawer and saw the documents inside, he was conducting an unauthorized general search, the results of which Deppe asks the Court to suppress. The Court should deny Deppe's motion because the magistrate judge's release order and Deppe's written consent authorized law enforcement officers to search Deppe's desk drawer, which was large enough to hold a laptop computer or PDA. Once Inspector Blanchard opened the drawer, the "Out of Town Ticket" receipt was in plain view, and the Court should therefore not suppress the inspector's testimony about it.

    A.    <u>The consent exception to the search warrant requirement</u>

"It is . . . well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 219 (1973). In the context of a consent search, the Supreme Court has explained that "[t]he scope of a search is generally defined by its expressed object." <u>Florida v. Jimeno</u>, 500 U.S. 248, 251 (1991). In <u>Jimeno</u>, the Court held that it was objectively reasonable for the police to conclude that the general consent to

---

[4] Inspector Blanchard also looked at the bank notice and asked Deppe about it. Deppe did not respond, however, and the government will not offer testimony about the bank notice at trial.

search the defendant's car, given in response to the officer's request to search for drugs, included consent to search containers within that car that might hold drugs. Id.

Circuit courts have similarly held that consent to search for a certain kind of item authorizes officers to search any container or location within the premises that could contain that item. See, e.g., United States v. Melendez, 301 F.3d 27, 33 (1st Cir. 2002) (officers did not exceed the scope of consent by dismantling a speaker, which was located in the area that the owner had allowed them to search, and in which the officers could have reasonably suspected drugs to be hidden); United States v. Saadeh, 61 F.3d 510, 518 (7th Cir. 1995) (consent to search for money, narcotics and guns authorized search of a toolbox and desk drawer, which were big enough to contain these items); c.f. United States v. Gray, 814 F.2d 49, 51 (1st Cir. 1987) ("any container situated within residential premises which are the subject of a validly-issued warrant may be searched if it is reasonable to believe that the container could conceal items of the kind portrayed in the warrant").

Here, both the magistrate judge's order and Deppe's written consent allowed the officers to search Deppe's house for computer equipment. There cannot be any serious dispute that computer equipment includes, not just large desktop computers, but also laptops and PDA's (many of which can connect to the internet). Because Deppe's desk drawer could have contained either a laptop or a PDA, the principles set out in the cases discussed above dictate that Inspector Blanchard was authorized to look in the drawer.

B.   The plain view exception

The next step in the analysis here involves the plain view exception to the limitations

imposed by the scope of the magistrate judge's order and Deppe's consent. Specifically, Deppe argues that Inspector Blanchard exceeded his authorization when he "rummaged through the defendant's desk drawer inspecting documents for potential evidentiary value." Defendant's Memorandum of Law, p.1. This argument fails, however, because the only document about which the government seeks to offer testimony at trial was in plain view once the drawer was opened.

The plain view doctrine permits the seizure of items located in plain view if "(1) the seizing officer has a prior justification for being in a position to see the item in plain view and (2) the evidentiary value of the item is immediately apparent." United States v. Perrotta, 289 F.3d 155, 167 (1st Cir. 2002) (internal quotations omitted). As is discussed in Section A above, Deppe's consent to the search for computer equipment authorized the inspector to open the desk drawer. This consent satisfies the first prong of the plain view analysis, because, as the Supreme Court has held, "[w]here the initial intrusion that brings the police within plain view of such an article is supported, not by a warrant, but by one of the recognized exceptions to the warrant requirement, the seizure is also legitimate." Horton v. California, 496 U.S. 128, 135 (1990).

That leaves the second prong – that the evidentiary value of the item be immediately apparent. The term "immediately apparent" has been defined as "sufficient to constitute probable cause to believe it is evidence of criminal activity." United States v. Hamie, 165 F.3d 80, 83 (1st Cir. 1999) (internal citations omitted). "A practical, nontechnical probability that incriminating evidence is involved is all that is required." Id. The "immediately

apparent" requirement does not demand any showing that the officer's belief that the item is evidence of criminal activity turn out to be correct or to have been more likely true than false. Texas v. Brown, 460 U.S. 730, 742 (1983).[5]

Here, it was immediately apparent to Inspector Blanchard that, sitting in Deppe's desk drawer was an unsigned version of one of the key documents from the investigation – the fraudulent "Out of Town Ticket" receipt. The fact that this version was unsigned has evidentiary significance because it supports the argument that Deppe did not receive this receipt from the ticket agency but rather created it himself. Deppe's counsel speculates, in paragraph 17 of his affidavit [attached to Defendant's Memorandum], that the document Inspector Blanchard saw came from the discovery material the government had produced. This speculation is unfounded, however, because, unlike the version of the "receipt" in the government's possession, the one that the inspector saw in Deppe's desk drawer was unsigned, had no fax header, and had no Postal Inspection Service exhibit sticker. 4/8/05 Blanchard memo [Attachment D].

The Court need not dwell, however, on whether the evidentiary value of the receipt was immediately apparent, because a lesser legal standard applies in a situation like this in which the officer did not seize the item. In Horton, the Supreme Court cautioned that, "[i]t is important to distinguish 'plain view,' as used . . . to justify *seizure* of an object, from an

---

[5] The Supreme Court has noted that "the use of the phrase 'immediately apparent' was very likely an unhappy choice of words, since it can be taken to imply that an unduly high degree of certainty as to the incriminatory character of evidence is necessary for an application of the 'plain view' doctrine." Brown, 460 U.S. at 741.

officer's mere observation of an item left in plain view . . . [because] the latter generally involves no Fourth Amendment search." 496 U.S. at 133 (emphasis in original) (internal quotations omitted); see also Brown, 460 U.S. at 739 (when a police officer has observed an object in "plain view," the owner's remaining interests in the object are merely those of possession and ownership). Here, because Inspector Blanchard was authorized to open the desk drawer, and because he did not take the receipt, his observation of it does not constitute a Fourth Amendment search or seizure that would justify suppression.

Finally, defense counsel suggests, in paragraph 5 of his affidavit, that Inspector Blanchard exceeded the scope of the consent by reading the bank notice that was sitting in the same desk drawer as the "Out of Town Ticket" receipt. The Court need not address this claim, however, because the government will not be offering any evidence about the bank notice at trial. And even if the Court were to find that the inspector did improperly read the bank notice, that would not affect the admissibility of the testimony the government is seeking to offer about the receipt. As the First Circuit stated in an analogous situation in Hamie, "the improper seizure of many items outside a warrant's scope . . . does not alone render the whole search invalid and require suppression and return of all documents seized. Instead, the normal remedy is to suppress the use of any items improperly taken." 165 F.3d at 84.

## CONCLUSION

For the above reasons, the Court should deny the defendant's motion to suppress.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

By:  /s/ Adam Bookbinder
 Adam J. Bookbinder
 Assistant U.S. Attorney

Dated: January 12, 2006

## CERTIFICATE OF SERVICE

I certify that this document filed through the ECF system will be sent electronically to counsel as identified on the Notice of Electronic Filing.

 /s/ Adam Bookbinder
Adam J. Bookbinder

Dated: January 12, 2006

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | Case No. 05-40007-FDS |
| v. ) | |
| ) | |
| MICHAEL R. DEPPE, ) | |
| ) | |
| Defendant. ) | |

### DEFENDANT'S CONSENT TO SEARCH

As a condition of my pretrial release in the above-captioned case, I, Michael Deppe, and my wife, Jessica Deppe, knowingly and voluntarily consent to allow unanounced searches of our home at 59 Bennett St., Hudson, Massachusetts during daylight hours (6:00 a.m. to 10:00 p.m.).

_____ 3/24/05
Michael Deppe

_____
Jessica Deppe

Dated: March 24, 2005

*My understanding is that the search is for computers only.*

Memo to file

## **DEPPE'S RESIDENCE APRIL 5, 2005**

At approximately 7:30AM, I entered 59 Bennett St, Hudson, MA, along with Lt. Michael Burks, Hudson Police Department, and Christopher Farley, Student Intern with my office. The purpose of this entry was to return items seized from Deppe incident to his arrest and to search the house for computers, electronic equipment consistent with computer usage, or any other item indicating Deppe owns, rents, or uses computers at another sight.
Mr. Deppe met me at the front door and let us into the residence. When asked, he stated his wife was still sleeping, no one else was in the house, he had no weapons in the house and he had two dogs, both caged in other rooms.
The house is a split level. Deppe, Mr. Farley and I went upstairs to the dining area to use the table. Deppe sat at the table while I pulled each piece of evidence out of the bag for Deppe to inspect and sign for. Deppe signed the evidence tags along with a handwritten receipt for the items returned. While Deppe was signing for the evidence, I asked him if Jessica had sold the two Daytonas she'd been selling on Friday. He answered "No."
Lt. Burks was searching in other rooms and I sent Mr. Farley off to assist him. I asked Deppe if he was gay. He said no. I told him that our Forensic Lab had started the analysis of the material on his computer and that we'd found hundreds, if not thousands of 'gay pictures' on it. Deppe said "Other people use that computer, people that work for me." I dropped the subject at this point.
I searched the kitchen area. I opened a small notebook and saw that it was Deppe wedding pictures. I asked Deppe when they were married and he told me.
At this point, I proceeded into the 'office' room and looked around. In this room was an open closet that contained several football helmets, several football jerseys, and boxes. There were also numerous boxes piled about the room and on top of them were boxes of baseballs. Also in the room was a large desk. I proceeded to look through the draws, every one of which was big enough to hold a laptop or PDA type device. When I opened the top right hand draw, I immediately saw a copy of the full page sized "Out Of Town Ticket Agency' receipt that Deppe had given to Englehart. Covering part of this receipt was a folded bank bill with the name 'Theis' on it. I picked up the 'Theis' receipt and saw that it was a bank notification to Deppe indicating his credit card account was to be charged back because Theis had failed to receive the helmets, jerseys, and baseballs that Theis had paid Deppe for. Deppe was standing in the doorway when I saw this and I asked him why the problem when I could see all those items in this room. Deppe said he didn't think he could talk to me. I said he could do whatever he wanted to do. It was up to him if he wanted to answer me. Deppe left the room without answering and made a phone call. I showed Lt. Burks the Out Of Town receipt and returned it to the draw. I searched the other draws in the desk and moved downstairs to the lower level.

I went into the garage and found nothing.  The lower level room next to the garage was piled high with boxes.  It all appeared to be sports memorabilia material, some of which was in view.
At this time, we exited the residence.  At some point during the search, I asked Deppe when he had bought the new Mercedes Benz S500 we saw parked in his driveway.  He refused to answer.


M. A. Blanchard
April 6, 2005

# Out Of Town Ticket Agency

This will serve as receipt of $183,000 funds received towards the following transaction,

10 50 yd line lower level seats-$50,000
40 lower level end-zone seats-$108,000
3 Playboy Party Tickets-$4,500
2 Players Association-$2,400
6 30-40 yd line lower level seats-$21,000
3 20 yd line lower level seats-$9,000
4 50 yd line upper level seats-$12,000
30 upper level end-zone seats-$60,000
Current total-$266,900

Jonathon Cohen          *Jonathon Cohen*
Out Of Town Ticket Agency
Cambridge, Massachusetts
617-247-1300


Inspection Service Exhibit 2
Label 113, July 1987

from Bill Englehart 2/4/05

UNITED STATES POSTAL INSPECTION SERVICE

BOSTON DIVISION



April 8, 2005

AUSA Adam Bookbinder
1 Courthouse Way, 9th FL.
Boston, MA 02210

RE: April 5, 2005 Deppe Residence Search

Adam, let me clarify what Lt. Burks and I saw in Deppe's house during the April 5, 2005 search.
I saw an "Out Of Town Ticket Agency" 'receipt' in the top, right hand draw of Deppe's large desk located in a room I'd describe as an office. This desk had three or four deep draws all capable of holding a laptop, PDA, or electronic items. When I opened the top draw, I immediately saw the "Out Of Town Ticket Agency" receipt. I removed the receipt from the draw and showed it to Lt. Burks. I pointed out to him the receipt name, the $183,000 amount, and the fact it was without a signature. Also, it contained no other marks such as fax header, exhibit seal, my initials, or dirt or smudges. I replaced the receipt and continued with my search.

M. A. Blanchard