UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| v. | ) | NO. 05-40007-FDS |
| MICHAEL R. DEPPE,<br>    Defendant | ) | |

**DEFENDANT'S SENTENCING MEMORANDUM**

The Defendant Michael Deppe through his attorney submits this sentencing memorandum. The Defendant is scheduled to be sentenced on December 21, 2006. For the reasons provided below the Defendant's recommendation is 27-33 months.

I.   BACKGROUND

On March 6, 2004 the Defendant plead guilty to counts 1-8 wire fraud and 13 and 14 indictment charging the defendant with mail fraud. The Defendant admitted that between March 2003 and December 2004, he defrauded approximately 27 victims out of approximately $115,000.00.

The Defendant admitted that on April 2, 2003, Mr. Gonsalez saw a listing that Mr. Deppe had placed on eBay stating that he had a plasma screen TV for sale; that Mr. Gonsalez and Mr. Deppe corresponded by e-mail, spoke on the telephone; that ultimately Mr. Gonsalez agreed to buy the TV for $6,400; that Mr. Deppe asked Mr. Gonsalez to wire-transfer half of the purchase price to Mr. Deppe's bank account, and falsely promised to ship the TV as soon as he received the wire transfer.

Mr. Gonzalez, on April 10th of 2003, did wire-transfer half of that money, $3,200 from his bank account in San Antonio, Texas, to Mr. Deppe's account, but that Mr. Deppe did not send Mr. Gonsalez the TV as he promised to do.

Mr. Deppe insisted that Mr. Gonsalez send him the second half of the money; that when Mr. Gonsalez declined to do that and demanded that Mr. Deppe return the money, Mr. Deppe refused.

In October 2003, Mr. Deppe contacted Mr. Diamond, who lives in Canada, and offered to sell him a Rolex watch. Ultimately they reached an agreement, and on October 30, 2003, Mr. Diamond wire transferred $6,600.00 from his Canada bank account to Mr. Deppe's bank account in Massachusetts.

Mr. Deppe then falsely told Mr. Diamond that he had sent the watch to him, gave him a Postal Service tracking number, when that watch did not arrive as promised, Mr. Diamond figured out that Mr. Deppe had, in fact, sent a package with that tracking number to a different address in Ontario in an effort to simply mislead Mr. Diamond.

After that, Mr. Deppe promised to send the Rolex, if Mr. Diamond would wire another $4,600.00 to his account and promised to deliver the watch in person on November 25, 2003. Mr. Diamond agreed to this and did wire another $4,600.00 to Mr. Deppe's bank account on November 24, 2003, but Mr. Deppe failed to show up for the meeting in New York; never provided the watch; and never gave Mr. Diamond his money back.

On February 1, 2004, Mr. Deppe e-mailed asking if Mr. Ryan Mugar was interested in buying a Rolex watch. Ultimately they agreed to a deal where Mr. Mugar would buy two watches for $9,800.00. Mr. Deppe gave Mr. Mugar a postal service tracking number that he said was a tracking number for the shipment of the watches.

When Mr. Mugar checked the postal service website, he learned that a package with that tracking number was headed to the correct California zip code where Mr. Mugar lived, but – believing that Mr. Deppe had sent the watches to him, Mr. Mugar wire-transferred $9,800 from his bank in California to Mr. Deppe's bank account in Massachusetts; but the package Mr. Deppe sent was never delivered to Mr. Mugar, because Mr. Deppe had intentionally sent it to a different address than the one Mr. Mugar had given to him. When the person who actually got that package opened it, they found that it only contained miscellaneous worthless sports cards.

Mr. Deppe took out from his bank account the money that Mr. Mugar had wired to him, and when Mr. Mugar called to demand the watches or his money back, Mr. Deppe made various promises, but never ultimately provided either the watches or a refund.

Mr. Deppe faxed Mr. Joe Carlson a signed contract stating that he guaranteed delivery of Rolex watch in return for the receipt of $3,350 in his bank account. Mr. Carlson wired this money, and Mr. Deppe told Mr. Carlson that he was sending the watch via the postal service, gave him a tracking number, but, again, the package with that tracking number was sent to a different person in a different neighboring town from where Mr. Carlson lived.

When the Postal Service inspected the package, again, it contained only worthless used music CDs and sports trading cards. Ultimately, Mr. Deppe provided Mr. Carlson with neither the Rolex watch, nor his $3,300-$3,500 back.

Brian Bell agreed to buy four watches from Mr. Deppe for $17,600; that he wired this money to Mr. Deppe's bank account; that Mr. Deppe mailed a package to Hilton Head, South Carolina, where Mr. Bell lives; that he gave Mr. Bell that tracking number, falsely telling him that that package contained his Rolex watches, but, in fact, once again, Mr. Deppe had sent the package to a different person and street address within the same zip code.

Ultimately, when the Postal Service found the person to whom the package was addressed, the person had no idea why a package containing only old newspapers had been sent to him. Mr. Bell demanded a refund – a refund of his watches and ultimately got neither from Mr. Deppe.

Between March 2003 and December 2004, Mr. Deppe defrauded 27 victims out of approximately $115,000; and in furtherance of the scheme, he sent the mailings and the wires listed in the indictment for Counts 1 through 8 and 13 –14.

The Defendant was convicted at trial on counts 9, 11-12 wire fraud and 15-16 mail fraud. The government produced evidence that Michael Deppe had given a receipt to William Englehart for $183,000 and that William Englehart had withdrawn $230,000 that he testified was given to Michael Deppe.

The government produced evidence at trial that in the fall of 2004, Deppe came in contact with William Englehart, an eBay user looking to start an Internet-based sports memorabilia company. For a couple of months, Deppe and Englehart together successfully sold sports memorabilia, allowing Aceprosports to become an eBay "powerseller" with a 99% positive customer feedback rating, key measures used by many eBay users to judge the trustworthiness of an eBay seller.

Approximately two weeks before the February 6, 2005 Superbowl, Englehart sold Superbowl tickets through Aceprosports. The week of the Superbowl, Deppe promised several times that the tickets would be sent to the customers, but the customers never received them. Deppe provided a string of excuses, and ultimately said that he would personally deliver the tickets to the customers when they arrived in Florida, where the Superbowl was being held.

Deppe then bought himself flights and Superbowl tickets through an eBay website and flew down to Florida for the Superbowl.

When several customers tracked him down at the Orlando airport, Deppe had no tickets. Deppe told customers several different stories, including that he had given the money to the ticket agency but had not yet received the tickets. He also told several customers that he still expected to receive the tickets and promised to deliver them before the game.

II.     SENTENCING CALCULATION

| | | |
|---|---|---|
| Base Offense | Level | 7 |
| More than 200,000 but less than 400,000 | + | 12 |
| Involve 10 or more victims | + | 2 |
| No increase for use of sophisticated means or obstruction of justice | + | 0 |
| | | 21 |
| A 3 level deduction for acceptance of responsibility or safety valve | - | 3 |
| | | 18 |

18 U.S.C. §3553 THE COURT SHALL IMPOSE A SENTENCE SUFFICIENT, BUT NOT GREATER THAN NECESSARY, TO COMPLY WITH THE PURPOSES SET FORTH IN PARAGRAPH (2) OF THIS SUBSECTION. THE COURT, IN DETERMINING THE PARTICULAR SENTENCE TO BE IMPOSED, SHALL CONSIDER:

1.      **The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant.**

The Defendant has no prior record of convictions. The Defendant has a gambling problem as substantiated by his interaction with the police when the debt was being collected. This was a series of nonviolent crimes and the period of incarceration for the Defendant of 27-33 months is sufficient.

2.      **The Need for the Sentence Imposed.**

(A)  <u>To Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense</u>.

The Defendant has been held at the Wyatt Detention Center awaiting trial and sentencing. A 27-33 month period of incarceration is sufficient.

(B)  <u>To Afford Adequate Deterrence to Criminal Conduct</u>.

A period of probation will deter the Defendant from further acts of fraud. The period of incarceration suggested along with his felony record as a result will insure that the defendant does not participate in further criminal activity.

(C)  <u>To Protect the Public From Further Crimes of the Defendant</u>.

The Defendant will as a result of his first criminal conviction will have a substantial period of time incarcerated. This will be a significant deterrent for future crimes.

(D)  <u>To Provide the Defendant with Needed Educational or Vocational Training, Medical Care, or Other Correctional Treatment in the Most Effective Manner</u>.

The Defendant has a documented gambling problem. The period of incarceration along with a probation sentence will provide an adequate time for the Defendant to get the treatment he needs for his addiction.

**3.   The Kinds of Sentences Available**

The Court can impose any sentence from 0-20 years.

**4.   The Kinds of Sentence and the Sentencing Range Established**

(A)  <u>The Applicable Category of Offense Committed by the Applicable Category of Defendant as Set Forth in the Guidelines.</u>

The Guideline calculation that was done as part of the presentence report did not include acceptance of responsibility and places the defendant in Criminal History Category I results in an adjusted offense level and sentence of 70-87 months. The Court wrote in *Koon v. United States,* 518 U.S. 81, 94, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996), "When a court finds an atypical case,

6

one to which a particular guideline linguistically applies but where conduct significantly differs from the norm, the court may consider whether a departure is warranted." *Id*. The district court is not left adrift, however, in determining which cases fall within and which cases fall outside of the heartland." The current advisory nature of the guidelines allows the sentencing judge to take into account factors which would not be available formerly as departures.

In paragraph 30 of the PSR the Government seeks an enhancement for obstruction of justice which indicates that the Postal Inspector Michael Blanchard observed a receipt in a drawer during a consensual search of the defendant's home. The Court heard a motion to suppress about this issue. It is clear from the finding in that motion the Government's return to the address and search for this item would be an illegal search and seizure. Since it is doubtful that the defense planned to introduce this article at trial they were under no obligation to turn it over in discovery. Absent a search warrant on this issue the most the government can claim is that their own illegal activity was thwarted by ineffective police work. The conversation between attorney and client addressed in Paragraph 31 is clearly not admissible.

The Government seeks an enhancement based on the sidebar for obstruction of justice. The burden is on the Government to seek this enhancement and without the benefit of hearing the sidebar because I was not the trial attorney, the Defendant objects to this enhancement because it is the Government's burden to prove the Defendant made this argument.

With regards to the argument that this sidebar was obstruction of justice, anytime an attorney files a motion in limine, motion to suppress or registers an objection to evidence whether he is a government or defense attorney he is attempting to prevent evidence from reaching the jury therefore potentially under this theory obstructing justice. It is clearly an unusual circumstance for the defendant to be at sidebar however since it was determined that he

had a right to participate in his defense it is immaterial whether his counsel or he objected to the Attorney Sussman's testimony.  A finding by the court that no attorney-client relationship existed between defendant and Attorney Sussman does not mean that the defendant could be precluded from making such an argument.  In fact if some type of agreement to commit fraud existed as is indicated by the Jury Instructions.  The defendant could have believed that Attorney Sussman was representing both individuals.

It is further clear from documentation present in the Motion to Suppress that William Englehart knew that Michael Deppe was charged with criminal offenses and it is reasonable that such information would be passed on to his attorney which would mean that any contact by Attorney Sussman would be a violation of the Board of Bar Overseers Rules.

There is no reliable evidence presented to the defendant that there are more than fifty total victims.  The evidence presented at trial was that the losses were $263,174 and that the watches scheme was $115,406 for twenty-seven months for a total of $378,580 in money loss.  To include William Englehart as a victim and instruct the jury that if another person committed the fraud with the victim is not a defense when the only possible co-conspirator is inconsistent with the verdict.  The Defendant should not receive an additional two levels for a scheme over $400,000.00 or over 50 victims.

**5.  The Need to Provide Restitution to Any Victims of the Offense**

The longer the Defendant is incarcerated the longer it will be before the Defendant is able to make restitution to the victims in this case.

III.    DEFENDANT'S RECOMMENDATION

A reduction of 2 to 3 levels as a safety valve reduction which is normally granted to first time offenders in drug cases who admit their responsibility and truthfully provide the

8

information relating to their crimes should be a factor which the court should consider outside of its normal guideline calculation. The defendant has no prior record, truthfully admitted to all the factors relating to the merchandise scheme but because of the Superbowl activity is not receiving any reduction. The safety valve is established to protect first time offenders from the draconian results of the statutes in drug cases. Michael Deppe is a first time offender and a similar analogy of his non-drug related offense is that the defendant would be punished under the guidelines more harshly than is warranted despite his admission of the crime and his lack of record.

The defendant plead to ten of the counts and had a jury trial which related to five of the remaining counts. Acceptance of responsibility is normally given to two or three point reduction only when it is applied to all counts. In the present case, it is clear that the government was spared significant time and expense and there is no argument that Michael Deppe did not truthfully admit to the merchandise scheme. It was apparently part of the government's proof at trial that the Aceprosports company which the Defendant was a participant in was in fact not conducting merchandise fraud since its good reputation was necessary for any successful completion of the scheme that the government said was taking place.

The government seeks to include any potential loss by William Englehart to drive up the guidelines. It may have been the government's theory that William Englehart did not participate with Deppe in this scheme however without the benefit of presence at trial and based on the jury instructions it is possible that the jury concluded that Englehart and the defendant were working together to produce the results therefore any losses by Englehart should not be included in a calculation of the dollar amount of the scheme.

Paragraph 46 of the PSR refers to a two level enhancement under 2B1.1(b)(8)(c) for using sophisticated means for accomplishing the Superbowl ticket scheme. If the logic of the

government's case is followed in this area and William Englehart was merely a dupe then Michael Deppe did not in fact use the Internet to contact the victims but made contact over the phone. If Englehart is not in fact a coconspirator then Deppe did not employ the Internet because Englehart was in good faith running his company over the Internet and Deppe actually defrauded Englehart of $230,000 of the money which makes Englehart the sole victim of the scheme for soliciting and receiving the money which he owes refunds to all the people for. The telephone would have been the only devise that Deppe would have employed and the only victims of Michael Deppe would have been the people he contacted individually where money was not refunded by Englehart.

                                                   Respectfully Submitted,
Michael Deppe
By his Attorney,

Dated: December 21, 2006                /S/   Daniel J. Bennett
Daniel J. Bennett
Mahoney, Diamond, Bennett & Harnais
15 Foster Street
Quincy, MA  02169
(617) 770-0000
B.B.O. 564059